**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Wade Boldt,

        Plaintiff,

    v.

Northern States Power Company,
a Minnesota Corporation,
d/b/a/ Xcel Energy,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 16-232 ADM/SER

---

Jenny M. Helling, Esq., Fabian May & Anderson, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Michael J. Moberg, Esq., and Alyssa M. Toft, Esq., Jackson Lewis P.C., Minneapolis, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On June 6, 2016, the undersigned United States District Judge heard oral argument on Plaintiff Wade Boldt's Motion to Remand to State Court [Docket No. 8]. Defendant Northern States Power Company d/b/a Xcel Energy ("NSP") opposes the Motion. For the reasons set forth below, Boldt's Motion is denied.

## II. BACKGROUND

In January 2016, Boldt sued NSP in Minnesota state court alleging disability discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, *et seq.*, based on a perceived disability of alcoholism. See Compl. [Docket No. 1, Attach. 1]. NSP removed this action, arguing it belongs in federal court because Boldt's claims are preempted by the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141 *et seq.*, and the Energy

Reorganization Act ("ERA"), 42 U.S.C. §§ 5801 *et seq*. See Notice of Removal [Docket No. 1] ¶ 6. NSP asserts federal subject matter jurisdiction under 28 U.S.C. § 1331. Boldt now moves to remand the case back to state court. Boldt argues that his MHRA claims are not preempted because the claims do not depend on an analysis of the labor agreement between NSP and his labor union, and because the claims do not implicate NSP's ability to operate a safe nuclear facility in accordance with the ERA and applicable federal regulations.

**A. Parties**

NSP is a Minnesota corporation that operates the Prairie Island Nuclear Generating ("PING") Plant near Red Wing, Minnesota. Compl. ¶¶ 2, 4. Boldt is a Special Construction Laborer and member of the Laborers Local 563, which is an affiliate of the Minnesota State Building and Construction Trade Council. Id. ¶¶ 3, 17. Beginning in 2002, Boldt's union assigned him to temporary projects at NSP's PING Plant. Id. ¶¶ 3–4.

**B. Labor Agreement**

As a union laborer, Boldt's work on NSP's property was governed by a labor agreement between NSP and Boldt's union (the "Labor Agreement"). Id. ¶ 17; Helling Aff. [Docket No. 9] Ex. A ("Labor Agreement").[1] The Labor Agreement includes the following provisions related to NSP's security, drug screening, and safety requirements:

> 5.1  Employees must meet all security and drug screening requirements as set forth by the Company[.]
>
> 5.9  The Employer and Employees shall abide by all Company

---

[1] The Labor Agreement submitted by Boldt's counsel is dated August 1, 2009, and was superseded by a Labor Agreement dated August 1, 2014. See Moberg Aff. [Docket No. 12] Ex. A. The parties disagree as to which Labor Agreement applies. The Court need not resolve the issue because the outcome of the Motion is the same under either version.

> safety regulations, policies, and plant-specific or site-specific work rules as may be applicable to the work site.
>
> 10.8  All personnel on the job agree to submit to job site personnel and/or vehicle inspections as security experience may require.

Labor Agreement ¶¶ 5.1, 5.9, 10.8.

## C. Policies and Regulations Governing Unescorted Access to the Nuclear Plant

Boldt's work at the PING Plant required him to maintain unescorted nuclear access authorization to the plant. Compl. ¶ 4. As such, Boldt needed to comply with NSP's Access Authorization Program ("AAP"), which included a Fitness for Duty ("FFD") Policy. Id.

NSP administered the AAP and FFD Policy pursuant to federal statutes and regulations governing the safety of operations at nuclear power plants. Id. Specifically, the Atomic Energy Act ("AEA"), Energy Reorganization Act ("ERA"), and regulations promulgated by the Nuclear Regulatory Commission (the "NRC Regulations") require nuclear licensees such as NSP to establish and administer an AAP that provides "high assurance" that individuals granted unescorted access to the nuclear power plant "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." 10 C.F.R. § 73.56(c). The NRC also requires nuclear licensees to implement an FFD Program that must:

> (a)  Provide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse;
>
> (b)  Provide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties;

3

      (c)      Provide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be subject to the FFD program; [and]

      (d)      Provide reasonable assurance that the workplaces subject to this part are free from the presence and effects of illegal drugs and alcohol . . . .

10 C.F.R. § 26.23.

      The NRC Regulations also obligate nuclear licensees to "implement drug and alcohol testing programs" and to "administer drug and alcohol tests . . . [i]n response to an individual's observed behavior or physical condition indicating possible substance abuse or after receiving credible information that an individual is engaging in substance abuse." 10 C.F.R. § 26.31(a), (c)(2); see also 10 C.F.R. § 26.69 ("Authorization with potentially disqualifying fitness-for-duty information").

**D. Events of November 8, 2013 and Ensuing Conditions on Boldt's Unescorted Access**

      On November 8, 2013, Boldt reported to the PING Plant at 5:00 p.m. to begin his night shift. Compl. ¶ 5. Boldt's supervisor approached him and told him that he smelled of alcohol and needed to take a breathalyzer test immediately. Id. In addition to the odor of alcohol, Boldt's supervisor observed that Boldt's eyes were glazed, his face was flushed, and he was shaking. Helling Aff. Ex. B at 12; Moberg Aff. Ex. B. Boldt completed an alcohol breath test. Compl. ¶ 5; Moberg Aff. Ex. C. Although the breathalyzer test results showed .000% blood alcohol content, Boldt admitted that he had consumed a "6-pack" earlier in the day at 9:00 a.m. Helling Aff. Ex. C; Moberg Aff. Ex. C. NSP also required Boldt to take a urinalysis drug screening test the following day, which he passed. Compl. ¶ 6.

      Following these events, Tasha Stephens, NSP's supervisor of the AAP and FFD

4

programs, scheduled Boldt for a chemical dependency assessment at an outpatient rehabilitation and treatment center. Id. ¶ 7; Moberg Aff. Ex. B. Boldt completed the assessment on November 14, 2013. Compl. ¶ 8. Stephens also arranged for Boldt to have an interview, exam, and blood draw with Dr. Thomas Jetzer, NSP's Medical Review Officer ("MRO"), on November 20, 2013. Id. ¶¶ 7, 9. After this appointment, Dr. Jetzer determined that for Boldt to maintain his unescorted access and be allowed back on the PING Plant site, he would first have to complete outpatient treatment. Id. ¶¶ 9–10. Boldt alleges that NSP's FFD Handbook did not authorize or require NSP to impose these further conditions or requirements on him. Id. ¶ 9. Nevertheless, Boldt completed 60 hours of outpatient treatment and 10 weeks of aftercare treatment as required by NSP. Id. ¶ 11.

In July 2014, after Boldt had completed the required treatment, Dr. Jetzer again reviewed Boldt's relevant information to determine his fitness for duty for access authorization. Id. ¶ 13; Moberg Aff. Ex. B. On or about July 24, 2014, NSP renewed Boldt's unescorted access but imposed several conditions that Boldt was required to satisfy in order to maintain his unescorted access. Helling Aff. Ex. B at 13–15; Compl. ¶ 13. The conditions, imposed pursuant to Dr. Jetzer's instructions, included eighteen months of drug and alcohol follow-up and E.G. [ethyl glucuronide] testing, as well as:

    1)    Attend AA/NA on a weekly basis for eighteen months upon granting unescorted access and obtain a sponsor. Provide proof of AA/NA attendance on AA Attendance Card (as provided by Security of comparable) by the last business day of each month to AA/FFD Supervisor.

    2)    Abstain from all mood altering substances, to include over the counter medications containing alcohol, such as Nyquil, unless approved by MRO minimally for the eighteen (18) month period upon granting of unescorted access. . . . Alcohol consumption for

> any reason is prohibited.
>
> 3) Comply with outpatient treatment and aftercare program recommendations for continued recovery/sobriety.
>
> 4) FFD to be reassessed following completion of eighteen (18) month period.

Helling Aff. Ex. B at 14; Moberg Aff. Ex. B; Compl. ¶ 13.

The conditions were included in a report entitled "Nuclear FFD Requirements and Recommendations." Helling Aff. Ex. B at 14. Boldt signed the report on July 25, 2014, to acknowledge that he had received a copy and that his supervisor had discussed the requirements with him. Id. at 15.

Soon after his unescorted access had been renewed, Boldt "did some investigation into E.G. testing" and learned that E.G. tests were extremely sensitive and would detect even trace amounts of ethyl glucuronide in urine from sources such as toothpaste, mouthwash, hairspray, and products Boldt was exposed to while working at NSP. Compl. ¶ 15. Boldt became concerned about the potential consequences of failing the test, which he understood were losing his job, his security clearance, and the ability to work in any nuclear power plant anywhere in the nation for the next five years. Id. Boldt reported his concerns to members of NSP management but was told there was nothing they could do for him. Id. ¶ 16. As a result, Boldt alleges he was "forced to take a layoff and was constructively discharged." Id. Boldt attempted to file a grievance with his union but was allegedly informed that because of other issues the union was dealing with at the time it could not support his grievance against NSP. Id. ¶ 17.

## III. DISCUSSION

### A. Motion to Remand Standard

A case shall be remanded back to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The party seeking removal and opposing remand has the burden of establishing federal subject matter jurisdiction. See In re Bus. Men's Assurance Co. of Am., 992 F.2d 181, 183 (8th Cir. 1993). When considering a motion to remand, a court must resolve all doubts about federal jurisdiction in favor of remand. See id.

### B. Preemption under § 301 of the LMRA

NSP argues that remand is improper because Boldt's state law discrimination claims are completely preempted by § 301 of the LMRA. The LMRA confers federal courts with jurisdiction over "[s]uits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). "The Supreme Court construes § 301 of the LMRA to preempt state law claims where the resolution of the state law claim 'substantially depends' on the interpretation of terms or provisions of a collective bargaining agreement." Hanks v. Gen. Motors Corp., 906 F.2d 341, 343 (8th Cir. 1990) (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985)); see also Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 410 n.10 (1988) ("Section 301 governs claims . . . substantially dependent on analysis of a collective-bargaining agreement.") (internal quotation omitted); Meyer v. Schnucks Markets, Inc., 163 F.3d 1048, 1051 (8th Cir. 1998) (stating that for complete preemption to exist, "the claim must require the interpretation of some specific provision of a CBA").

Boldt's MHRA claims are premised on allegations that NSP discriminated against him by exceeding its authority under the company's policies and procedures for drug and alcohol testing. See Compl. ¶ 9 ("Defendant's FFD Handbook did not authorize or require Defendant to impose these further conditions or requirements upon Plaintiff.").[2] Boldt describes his claims as an attempt "to impose liability on NSP for its discriminatory conduct under the MHRA, which was outside of the NRC Regulations." Pl.'s Mem. Supp. Mot. Remand [Docket No. 10] at 18. Boldt asserts that "after Boldt passed initial screening tests, NSP's FFD Policy did not authorize it to impose further conditions or requirements upon [him]." Id. at n.5 (citing Compl. ¶ 9).

Boldt's claims substantially depend on the interpretation of the Labor Agreement's provisions relating to drug and alcohol testing and safety requirements. For example, Paragraph 5.9 of the Labor Agreement requires the "Employer and Employees [to] abide by all Company safety regulations, policies, and plant-specific or site-specific work rules." Labor Agreement ¶ 5.9. Boldt claims that NSP acted beyond the company's stated safety regulations and policies by continuing to subject him to additional conditions after he had passed his drug and alcohol tests. NSP counters that its safety regulations, including the NRC Regulations, permitted it to impose conditions on Boldt's unescorted access authorization. Thus, Paragraph 5.9 of the Labor Agreement must be interpreted to identify the specific requirements under NSP's "safety

---

[2] Boldt alleges two claims under the MHRA. First, Boldt alleges NSP violated Minn. Stat. § 363A.17, which makes it "an unfair discriminatory practice for a person engaged in a trade or business . . . to discriminate in the basic terms, conditions, or performance of [a] contract because of a person's . . . disability, unless the alleged . . . discrimination is because of a legitimate business purpose." Second, Boldt alleges NSP violated Minn. Stat. § 363A.08, which provides in relevant part: "Except when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of . . . disability, . . . to . . . discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2.

regulations, policies, and plant-specific or site-specific work rules," and to determine whether NSP acted in compliance with those regulations, policies, and work rules. Similarly, Paragraph 5.1 of the Labor Agreement requires all employees to "meet all security and drug screening requirements as set forth by the Company." Id. ¶ 5.1. Boldt alleges he met all security and drug screening requirements when he passed his breathalyzer and urinalysis tests and completed his outpatient and aftercare programs, and that NSP was not authorized to require him to submit to further drug screening. Resolution of Boldt's claim will require an interpretation of the "security and drug screening requirements as set forth by the Company" to determine whether NSP exceeded those requirements.

Boldt argues that preemption is not warranted merely because NSP has asserted a federal defense—namely, that it was acting in compliance with the AAP, FFD Policy and NRC Regulations. It is true that "a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." Humphrey v. Sequentia, Inc., 58 F.3d 1238, 1244 (8th Cir. 1995) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 394, 399 (1987) (emphasis in original). However, the issue of whether NSP was acting in compliance with its drug testing and safety policies, including the FFD Policy and NRC Regulations, is not just a defense. Boldt's discrimination claims are based on allegations that NSP discriminated against him by acting outside of those policies and regulations and imposing unwarranted conditions on his unauthorized access.

Boldt argues that the Court need not analyze references to the FFD requirements or nuclear regulations in the Labor Agreement to determine whether he was subjected to the restrictions and conditions based on a discriminatory motive. Pl.'s Reply Mem. at 5 [Docket No.

11]. The Court disagrees. In determining NSP's motive for imposing the restrictions and conditions on Boldt, it must be determined whether NSP was motivated by a duty to comply with the Labor Agreement and its underlying policies and procedures governing drug testing and plant safety.

Because Boldt's state law claims cannot be resolved without interpreting the Labor Agreement's provisions related to drug and alcohol testing and safety requirements, the claims are preempted under § 301 of the LMRA.

**C. Preemption under ERA and NRC Regulations**

In addition to being preempted by the LMRA, Boldt's state law discrimination claims are preempted by federal law and corresponding NRC Regulations governing nuclear safety. A state law falls within the preempted zone of nuclear safety if it has a "direct and substantial effect on the decisions by those who . . . operate nuclear facilities." English v. Gen. Elec. Co., 496 U.S. 72, 85 (1990). Preemption also exists if the state law actually conflicts with federal law, such as when "it is impossible for a private party to comply with both state and federal requirements." Id. at 79.

The MHRA forbids an employer from discriminating against a person with respect to the conditions or privileges of employment because of a disability except when based on a bona fide occupational qualification. See Minn. Stat. § 363A.08, subd. 2. Thus, if the reason NSP subjected Boldt to additional requirements and conditions on his unescorted access was because NSP regarded him as having the disability of alcoholism, NSP will be liable under the MHRA unless it can show the requirements and conditions were based on a bona fide occupational qualification.

10

The MHRA's requirements related to disability discrimination have a direct and substantial effect on decisions made by those who operate nuclear facilities.  Nuclear power plant operators such as NSP have a duty under the NRC Regulations to "provide reasonable assurance that individuals [who are granted unescorted access to nuclear power plant protected areas] are trustworthy and reliable as demonstrated by the avoidance of substance abuse," and "that the workplaces . . . are free from the presence and effects of illegal drugs and alcohol."  10 C.F.R. § 26.23(a),(d).  The NRC Regulations also obligate NSP to "implement drug and alcohol testing programs" and "administer drug and alcohol tests . . . [i]n response to an individual's observed behavior or physical condition indicating possible substance abuse."  10 C.F.R. § 26.31(a), (c)(2).  A claim under the MHRA for disability discrimination based on perceived alcoholism has the potential to affect radiological safety decisions because an employer is forced to decide between:  (1) being potentially liable under the MHRA for imposing alcohol testing and other conditions on a member of a protected class, or (2) allowing an employee who the employer regards as having a substance abuse problem to continue to have condition-free unescorted access to protected areas of a nuclear power plant.

A similar tension was recognized in Hanni v. Cleveland Electric Illuminating Company, which involved a wrongful discharge claim by a former nuclear power plant employee.  622 N.E.2d 340, 341 (Ohio Ct. App. 1993).  Hanni's employer revoked his unescorted access authorization after learning that he had been charged with multiple offenses outside the workplace, including felonious assault, driving under the influence of alcohol, and driving without a valid diver's license.  Id.  The employer argued that the revocation was required by the nuclear power plant's policy and by NRC Regulations because the employee's conduct showed a

lack of respect for rules and regulations, causing the employer to doubt the employee's trustworthiness and reliability. Id. at 341, 343–44. The Hanni court held that the state wrongful discharge claim was preempted because "impeding [an employer's] ability to discharge an employee pursuant to NRC regulations which are expressly aimed at promoting safety in nuclear facilities, is a direct and substantial interference with those regulations." Id. at 346. Similarly here, impeding NSP's ability to place conditions on Boldt's unescorted access based on substance abuse concerns is a "direct and substantial effect on the decisions by those who . . . operate nuclear facilities." English, 496 U.S. at 85.[3]

Not only do Boldt's state law claims have a direct and substantial effect on the decisions of those who operate nuclear plants, the state law claims also conflict with NRC Regulations that obligate NSP to "safeguard the public welfare by restricting unsupervised access to secure areas to those not likely to pose a risk to operation of the plant." McCoy v. Pa. Power & Light Co., 933 F. Supp. 438, 444 (M.D. Pa. 1996). NSP would be forced to compromise its obligation under the NRC regulations if it were not allowed to impose conditions on an employee's

---

[3] In arguing that his state law disability discrimination claims do not have a direct and substantial effect on NSP's nuclear facility operations, Boldt cites to Brown v. Northeast Nuclear Energy Company, 48 F. Supp. 2d 116 (D. Conn. 1999). Brown was not a disability discrimination case. Rather, the plaintiff in Brown sued his employer for due process violations, violations of the Code of Federal Regulations, tortious interference with contractual rights, breach of an implied contract of employment, and other claims after his security clearance was revoked. Id. at 119. The court in Brown found that the record was not sufficiently developed to allow for the determination that enforcement of the plaintiff's claims would pose a real or potential conflict with the federal regulations. Id. at 120–21. In contrast, the record here demonstrates a real or potential conflict between disability discrimination under the MHRA and a nuclear licensee's ability to impose conditions prompted by substance abuse concerns and recommended by the nuclear licensee's medical review officer on an employee's unescorted access authorization.

unescorted access that NSP's medical review officer deems necessary for ensuring the employee's fitness for duty at the nuclear power plant.  See, e.g., Burns Int'l Sec. Servs., Inc. v. Commonwealth, 547 A.2d 818, 823 (Pa. Commw. Ct. 1988) (holding state disability discrimination claim preempted by federal law because "the pervasive nature of the NRC's regulations governing the safety of operations at a nuclear power plant, including the minimum physical and mental qualifications required of security personnel employed at such a facility, [makes] clear that the proper standard for ascertaining [the plaintiff's] fitness for duty is derived from federal law").

Therefore, Boldt's state law discrimination claims are preempted by federal law and corresponding NRC Regulations governing nuclear safety.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Wade Boldt's Motion to Remand to State Court [Docket No. 8] is **DENIED**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 18, 2016.