Wade Boldt,

       Plaintiff,

v.

Northern States Power Company,
a Minnesota Corporation,
d/b/a/ Xcel Energy,

       Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-232 ADM/SER

___

Jenny M. Helling, Esq., and Nicholas G. B. May, Esq., Fabian May & Anderson, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Michael J. Moberg, Esq., and Alyssa M. Toft, Esq., Jackson Lewis P.C., Minneapolis, MN, on behalf of Defendant.

___

## I. INTRODUCTION

On February 16, 2017, the undersigned United States District Judge heard oral argument on Defendant Northern States Power Company d/b/a Xcel Energy's ("NSP") Motion for Judgment on the Pleadings [Docket No. 25]. Plaintiff Wade Boldt ("Boldt") opposes the Motion. For the reasons set forth below, NSP's Motion is granted.

## II. BACKGROUND

In January 2016, Boldt sued NSP in Minnesota state court alleging disability discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.08 and 363A.17. See Compl. [Docket No. 1, Attach. 1]. NSP removed this action to federal court, arguing that Boldt's claims are preempted by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, *et seq.*, and the Energy Reorganization Act ("ERA"), 42 U.S.C. § 5801, *et seq.*

See Notice of Removal [Docket No. 1] ¶ 6. Boldt then moved to remand the case back to state court. See Mot. Remand [Docket No. 8]. On July 18, 2016, this Court denied the motion to remand, holding that Boldt's MHRA claims were completely preempted by the LMRA and by federal law governing nuclear safety. See Mem. Op. & Order [Docket No. 17] ("July 18 Order"). NSP now moves for judgment on the pleadings, arguing that the preemption analysis in the July 18 Order applies with equal force to the motion for judgment on the pleadings. Boldt opposes the motion with respect to Count I of the Complaint, which asserts a claim for disability discrimination based on a perceived disability of alcoholism under Minn. Stat. § 363A.17.[1] Boldt argues that the Court's July 18 Order erroneously concluded that Boldt's MHRA claims are preempted.

**A. Parties**

NSP, a Minnesota corporation, operates the Prairie Island Nuclear Generating ("PING") Plant near Red Wing, Minnesota. Compl. ¶¶ 2, 4. Boldt is a Special Construction Laborer and member of the Laborers Local 563, which is an affiliate of the Minnesota State Building and Construction Trade Council. Id. ¶¶ 3, 17. Beginning in 2002, Boldt's union assigned him to temporary projects at NSP's PING Plant. Id. ¶¶ 3–4.

---

[1] Count II of the Complaint asserts a claim for business discrimination under Minn. Stat. § 363A.08. See Compl. at ¶¶ 23–27. Boldt does not challenge NSP's Motion for Judgment on the Pleadings with respect to Count II. See Pl.'s Mem. Opp'n Mot. J. Pleadings [Docket No. 29] at 11 n.2.

**B. Labor Agreement**

As a union laborer, Boldt's work on NSP's property was governed by a labor agreement between NSP and Boldt's union (the "Labor Agreement"). Id. ¶ 17; Helling Aff. [Docket No. 9] Ex. A ("Labor Agreement").[2] The Labor Agreement includes the following provisions related to NSP's security, drug screening, and safety requirements:

> 5.1 Employees must meet all security and drug screening requirements as set forth by the Company[.]
>
> 5.9 The Employer and Employees shall abide by all Company safety regulations, policies, and plant-specific or site-specific work rules as may be applicable to the work site.
>
> 10.8 All personnel on the job agree to submit to job site personnel and/or vehicle inspections as security experience may require.

Labor Agreement ¶¶ 5.1, 5.9, 10.8.

**C. Policies and Regulations Governing Unescorted Access to the Nuclear Plant**

Boldt's work at the PING Plant required him to maintain unescorted nuclear access authorization to the plant. Compl. ¶ 4. This authorization required Boldt to comply with NSP's Access Authorization Program ("AAP"), which included a Fitness for Duty ("FFD") Policy. Id.

NSP administered the AAP and FFD Policy pursuant to federal statutes and regulations governing the safety of operations at nuclear power plants. Id. Specifically, the Atomic Energy Act ("AEA"), ERA, and regulations promulgated by the Nuclear Regulatory Commission (the "NRC Regulations") require nuclear licensees such as NSP to establish and administer an AAP

---

[2] The Labor Agreement submitted by Boldt's counsel is dated August 1, 2009, and was superseded by a Labor Agreement dated August 1, 2014. See Moberg Aff. [Docket No. 28] Ex. A. The parties disagree as to which Labor Agreement applies. The Court need not resolve the dispute because the outcome of the Motion is the same under both agreements.

3

that provides "high assurance" that individuals granted unescorted access to the nuclear power plant "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." 10 C.F.R. § 73.56(c). Nuclear licensees are also required to implement an FFD Program that must:

> (a) Provide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse;
>
> (b) Provide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties;
>
> (c) Provide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be subject to the FFD program; [and]
>
> (d) Provide reasonable assurance that the workplaces subject to this part are free from the presence and effects of illegal drugs and alcohol . . . .

10 C.F.R. § 26.23.

The NRC Regulations also mandate nuclear licensees to "implement drug and alcohol testing programs" and "administer drug and alcohol tests . . . [i]n response to an individual's observed behavior or physical condition indicating possible substance abuse or after receiving credible information that an individual is engaging in substance abuse." 10 C.F.R. § 26.31(a), (c)(2); see also 10 C.F.R. § 26.69 ("Authorization with potentially disqualifying fitness-for-duty information").

The NRC Regulations additionally set forth detailed requirements related to fitness-for-

4

duty determinations, including the roles of Medical Review Officers ("MRO") and Substance Abuse Experts ("SAE") in making the determinations. See 10 C.F.R. §§ 26.181–189. The regulations provide that if an employee "may be in violation of the licensee's . . . FFD policy or is otherwise unable to safely and competently perform his or her duties," a "determination of fitness must be made by a licensed or certified professional." 10 C.F.R. § 26.189(a). The SAE's role "is to protect public health and safety and the common defense and security by professionally evaluating the individual and recommending appropriate education/treatment, follow-up tests, and aftercare." 10 C.F.R. § 26.187(g). "The SAE is not an advocate for the licensee or other entity, or the individual." Id. Under the regulations, a licensee such as NSP has no authority to alter an SAE's evaluation and recommendations:

> <u>Neither the individual nor licensees and other entities may seek a second determination of fitness if a determination of fitness under this part has already been performed by a qualified professional</u> employed by or under contract to the licensee or other entity. After the initial determination of fitness has been made, the professional may modify his or her evaluation and recommendations based on new or additional information from other sources including, but not limited to, the subject individual, another licensee or entity, or staff of an education or treatment program. <u>Unless the professional who made the initial determination of fitness is no longer employed by or under contract to the licensee or other entity, only that professional is authorized to modify the evaluation and recommendations</u>. . . .

10 C.F.R. 26.189 (emphases added).

**D. Events of November 8, 2013 and Ensuing Conditions on Boldt's Unescorted Access**

On November 8, 2013, Boldt reported to the PING Plant at 5:00 p.m. to begin his night shift. Compl. ¶ 5. Boldt's supervisor approached him and told him that he smelled of alcohol and needed to take a breathalyzer test immediately. Id. In addition to the odor of alcohol, Boldt's supervisor observed that Boldt's eyes were glazed, his face was flushed, and he was

5

shaking.  Helling Aff. Ex. B at 12; Moberg Aff. Ex. C.  Boldt completed an alcohol breath test.  Compl. ¶ 5; Moberg Aff. Ex. C.  Although the breathalyzer test results showed .000% blood alcohol content, Boldt admitted that he had consumed a "6-pack" at 9:00 a.m. that morning.  Helling Aff. Ex. C; Moberg Aff. Ex. E.  NSP also required Boldt to take a urinalysis screening test the following day, which he passed.  Compl. ¶ 6.

Following these events, Tasha Stephens ("Stephens"), NSP's supervisor of the AAP and FFD programs, scheduled Boldt for a chemical dependency assessment at an outpatient rehabilitation and treatment center.  Id. ¶ 7.  Boldt completed the assessment on November 14, 2013.  Compl. ¶ 8.  Boldt alleges that the assessment falsely stated he had tested positive for alcohol at work.  Id.  Boldt informed the treatment center staff that he had passed the breathalyzer and urinalysis screening tests.  Id.  Stephens also arranged for Boldt to have an interview, exam, and blood draw with Dr. Thomas Jetzer ("Jetzer"), NSP's Medical Review Officer ("MRO") and Substance Abuse Expert ("SAE"), on November 20, 2013.  Id. ¶¶ 7, 9.  Dr. Jetzer determined that for Boldt to maintain his unescorted access authorization and to be allowed back on the PING Plant site, he would first have to complete 60 hours of outpatient treatment.  Id. ¶¶ 9–10; Moberg Aff. Ex. D.

Boldt alleges that NSP's FFD Handbook did not authorize or require NSP to impose these further conditions or requirements on him.  Compl. ¶ 9.  Boldt complained to Stephens and to several other members of NSP management that he did not understand why NSP was forcing him to go to rehabilitation and refusing to allow him to return to work when he had not tested positive for alcohol or drugs.  Id. ¶¶ 9–10.  Nevertheless, Boldt completed 60 hours of outpatient treatment and 10 weeks of aftercare treatment, which NSP required before Boldt could return to

6

work. Id. ¶ 11.

In July 2014, after Boldt had completed the required treatment, Dr. Jetzer again reviewed Boldt's relevant information to determine his fitness for duty with regard to his unescorted access authorization. Id. ¶ 13; Moberg Aff. Ex. D at 2. On or about July 24, 2014, NSP renewed Boldt's unescorted access authorization but imposed several conditions that Boldt was required to satisfy to maintain his unescorted access. Helling Aff. Ex. B at 13–15; Compl. ¶ 13. The conditions, imposed pursuant to Dr. Jetzer's instructions, included eighteen months of drug and alcohol follow-up and E.G. [ethyl glucuronide] testing, as well as:

1) Attend AA/NA on a weekly basis for eighteen months upon granting unescorted access and obtain a sponsor. Provide proof of AA/NA attendance on AA Attendance Card (as provided by Security of comparable) by the last business day of each month to AA/FFD Supervisor.

2) Abstain from all mood altering substances, to include over the counter medications containing alcohol, such as Nyquil, unless approved by MRO minimally for the eighteen (18) month period upon granting of unescorted access. . . . Alcohol consumption for any reason is prohibited.

3) Comply with outpatient treatment and aftercare program recommendations for continued recovery/sobriety.

4) FFD to be reassessed following completion of eighteen (18) month period.

Helling Aff. Ex. B at 14; Moberg Aff. Ex. G; Compl. ¶ 13.

The conditions were included in a report entitled "Nuclear FFD Requirements and Recommendations." Helling Aff. Ex. B at 14. Boldt signed the report on July 25, 2014, to acknowledge that he had received a copy and that his supervisor had discussed the requirements with him. Id. at 15.

Soon after his unescorted access had been renewed, Boldt "did some investigation into E.G. testing" and learned that E.G. tests were extremely sensitive and would detect even trace amounts of ethyl glucuronide in urine from sources such as toothpaste, mouthwash, hairspray, and products Boldt was exposed to while working at NSP. Compl. ¶ 15. Boldt became concerned about the potential consequences of failing the test, which he understood were losing his job, his security clearance, and the ability to work in any nuclear power plant anywhere in the nation for the next five years. Id. Boldt reported his concerns about E.G. testing to members of NSP management but was told there was nothing they could do for him. Id. ¶ 16. As a result, Boldt alleges he was "forced to take a layoff and was constructively discharged." Id. Boldt attempted to file a grievance with his union but was allegedly informed that because of other issues the union was dealing with at the time the union could not support his grievance against NSP. Id. ¶ 17.

### III. DISCUSSION

**A. Judgment on the Pleadings Standard**

In considering a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, the court views "all facts pleaded by the nonmoving party as true and grant[s] all reasonable inferences in favor of that party." Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008). Judgment on the pleadings is appropriate "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002). This is the same standard used to resolve a motion to dismiss under Rule 12(b)(6). Ashley Cty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009).

In deciding a motion for judgment on the pleadings, a court considers the pleadings and "some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999)). For example, courts may consider "orders, items appearing in the record of the case, and exhibits attached to the complaint." Id.[3]

**B. Preemption under § 301 of the LMRA**

NSP invokes the doctrine of ordinary preemption to argue that Boldt's state law claim is preempted by § 301 of the LMRA and must be dismissed.

There are two kinds of preemption—"complete" and "ordinary"—that relate to § 301 of the LMRA:

> Complete preemption necessarily transforms a state-law claim that is based upon a CBA or is inextricably intertwined with a CBA into a federal claim and provides federal courts with jurisdiction. Thus, complete preemption aligns with § 301's congressional mandate to fashion a body of federal common law for disputes arising out of labor contracts. In contrast, ordinary preemption prevents either a state or federal court from hearing a claim that should initially have been taken through the arbitration procedure established in the controlling CBA. Thus, the ordinary preemption doctrine aligns with the second purpose of § 301—i.e., the need to preserve the effectiveness of arbitration.

In re Nat'l Hockey League Players' Concussion Injury Litig., 189 F. Supp. 3d 856, 866 (D. Minn. 2016). Thus, complete preemption is a jurisdictional doctrine which "concern[s] the proper forum—federal or state—in which a claim should be litigated," whereas ordinary

---

[3] All exhibits considered by the Court in connection with this Motion are part of the record in this case, having previously been submitted in connection with Boldt's Motion to Remand.

preemption "provides a substantive defense to a state law action on the basis of federal law, in whatever forum the case . . . is litigated." Williams v. Nat'l Football League, 598 F.3d 932, 935 (8th Cir. 2009) (Colloton, J., dissenting from denial of rehearing en banc) (emphasis in original). If a plaintiff's claim is preempted under ordinary preemption, "then it must be dismissed." In re Nat'l Hockey League, 189 F. Supp. 3d at 865 (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220–21 (1985)). Although ordinary preemption and complete preemption are two separate doctrines, the analysis for determining if a plaintiff's claims are preempted by § 301 are "seemingly identical." Id. at 866 n.5 (comparing Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405–10 & n.10 (1988) (ordinary preemption analysis), with Caterpillar Inc. v. Williams, 482 U.S. 386, 388 (1987) (complete preemption analysis)).

A state law claim is preempted under § 301 of the LMRA if "resolution of the state law claim 'substantially depends' on the interpretation of terms or provisions of a collective bargaining agreement." Hanks v. Gen. Motors Corp., 906 F.2d 341, 343 (8th Cir. 1990) (quoting Allis-Chalmers, 471 U.S. at 220; Williams v. Nat'l Football League, 582 F.3d 863, 874 (8th Cir. 2009) ("[S]ection 301 preemption applies where a state-law claim is dependent upon an analysis of the relevant CBA, meaning that the plaintiff's state-law claim requires interpretation of a provision of the CBA.") (internal quotation marks omitted). Put another way, a state law is preempted if it is "inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers, 471 U.S. at 213; Hanks, 906 F.2d at 343.

This Court has already concluded that Boldt's MHRA claim substantially depends on the interpretation of the Labor Agreement's provisions relating to drug and alcohol testing and safety requirements. As explained in the July 18 Order:

10

> Boldt's claims substantially depend on the interpretation of the Labor Agreement's provisions relating to drug and alcohol testing and safety requirements. For example, Paragraph 5.9 of the Labor Agreement requires the "Employer and Employees [to] abide by all Company safety regulations, policies, and plant-specific or site-specific work rules." Labor Agreement ¶ 5.9. Boldt claims that NSP acted beyond the company's stated safety regulations and policies by continuing to subject him to additional conditions after he had passed his drug and alcohol tests. NSP counters that its safety regulations, including the NRC Regulations, permitted it to impose conditions on Boldt's unescorted access authorization. Thus, Paragraph 5.9 of the Labor Agreement must be interpreted to identify the specific requirements under NSP's "safety regulations, policies, and plant-specific or site-specific work rules," and to determine whether NSP acted in compliance with those regulations, policies, and work rules. Similarly, Paragraph 5.1 of the Labor Agreement requires all employees to "meet all security and drug screening requirements as set forth by the Company." Id. ¶ 5.1. Boldt alleges he met all security and drug screening requirements when he passed his breathalyzer and urinalysis tests and completed his outpatient and aftercare programs, and that NSP was not authorized to require him to submit to further drug screening. Resolution of Boldt's claim will require an interpretation of the "security and drug screening requirements as set forth by the Company" to determine whether NSP exceeded those requirements.

July 18 Order at 8–9.

Boldt challenges this conclusion of preemption by arguing that no provision of the Labor Agreement must be interpreted for Boldt to demonstrate that he is entitled to relief. However, the Complaint places NSP's safety regulations and drug screening requirements squarely at issue by alleging that "[a]t all times while working for Defendant, Plaintiff complied with Defendant's Access Authorization Program and FFD Policy and program," and that "Defendant's FFD Handbook did not authorize Defendant to impose these further conditions or requirements upon

Plaintiff." Compl. ¶¶ 4, 9.[4] Thus, resolution of Boldt's claim will require interpretation of the Labor Agreement's provisions regarding safety regulations and drug screening requirements, and his claim is inextricably intertwined with those provisions.

Boldt also argues that no interpretation of the Labor Agreement is required because his discrimination claim revolves around NSP's motive for its conduct. The Court has already considered and rejected this argument:

> Boldt argues that the Court need not analyze references to the FFD requirements or nuclear regulations in the Labor Agreement to determine whether he was subjected to the restrictions and conditions based on a discriminatory motive. Pl.'s Reply Mem. at 5 [Docket No. 11]. The Court disagrees. In determining NSP's motive for imposing the restrictions and conditions on Boldt, it must be determined whether NSP was motivated by a duty to comply with the Labor Agreement and its underlying policies and procedures governing drug testing and plant safety.

July 18 Order at 9–10.

Boldt further argues that dismissal of his claims would deprive him of any remedy for his state law claim. However, the proper forum for Boldt to have pursued his claim was through arbitration under the Labor Agreement. See In re Nat'l Hockey League, 189 F. Supp. 3d at 866 ("[O]rdinary preemption prevents either a state or federal court from hearing a claim that should initially have been taken through the arbitration procedures established in the controlling CBA."). Although Boldt alleges he "attempted to file a grievance with his union," his union did not grieve it "based on other issues Local 563 was dealing with at the time." Compl. ¶ 17. If Boldt was not satisfied with this decision, he could have challenged the union's inaction by

---

[4] Boldt argues that these allegations are rebuttals to NSP's defenses raised in the Minnesota Department of Human Rights investigation into Boldt's claim. Pl.'s Mem. Opp'n at 16 & n.5. However, allegations in a complaint are not properly characterized as "rebuttals."

12

bringing a "hybrid action" under § 301 to determine whether the union violated its duty of fair representation, and at the same time litigate whether NSP had breached the drug and safety provisions of the Labor Agreement. See, e.g., Miner v. Local #373, Int'l Bhd. of Teamsters, 513 F.3d 854, 860 (8th Cir. 2008).

Because Boldt's state law claim cannot be resolved without interpreting the Labor Agreement's provisions related to drug and alcohol testing and safety requirements, the claim is preempted under § 301 of the LMRA and must be dismissed under the doctrine of ordinary preemption.

## C. Preemption under ERA and NRC Regulations

Even if Boldt's state law discrimination claim were not preempted under § 301 of the LMRA, the claim must be dismissed because (1) it falls within the preempted field of nuclear safety, and (2) it directly conflicts with federal law.

### 1. Field Preemption

"[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," or "to the extent that [state law] actually conflicts with federal law. English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). The "Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S 190, 212 (1983). A state law falls within the preempted zone of nuclear safety if it has a "direct and substantial effect on the decisions made by those who . . . operate nuclear facilities concerning radiological safety levels." English, 496 U.S. at 85.

The Court has already held that Boldt's MHRA claim has a direct and substantial effect on the radiological safety decisions of those who operate nuclear facilities:

> A claim under the MHRA for disability discrimination based on perceived alcoholism has the potential to affect radiological safety decisions because an employer is forced to decide between: (1) being potentially liable under the MHRA for imposing alcohol testing and other conditions [required by the employer's medical expert] on a member of a protected class, or (2) allowing an employee who the employer['s medical expert] regards as having a substance abuse problem to continue to have condition-free unescorted access to protected areas of a nuclear power plant.

July 18 Order at 11; see also Hanni v. Cleveland Elec. Illuminating Co., 622 N.E.2d 340, 346 (Ohio Ct. App. 1993) ("[I]mpeding [an employer's] ability to discharge an employee pursuant to NRC regulations which are expressly aimed at promoting safety in nuclear facilities, is a direct and substantial interference with those regulations.").

**2. Conflict Preemption**

Preemption also exists if the state law actually conflicts with federal law, such as when "it is impossible for a private party to comply with both state and federal requirements." English, 496 U.S. at 79. NSP argues that it had no authority to disregard Dr. Jetzer's required conditions on Boldt's unescorted access, and doing so would have placed NSP in direct contravention of NRC Regulations. The Court agrees.

The NRC Regulations provide that a determination of fitness may be conducted based on "observed behavior." 10 C.F.R. § 26.189(c). The Regulations further state that

> [i]f there is no conclusive evidence of an FFD policy violation but there is a significant basis for concern that the individual may be impaired while on duty, then the subject individual <u>must</u> be determined to be unfit for duty. . . . [T]he professional who made the determination of fitness shall consult with the licensee's . . . management personnel to identify the actions required to ensure that

14

> any possible limiting condition does not represent a threat to workplace or public health and safety. Licensee or other entity management personnel <u>shall</u> implement the required actions.

10 C.F.R. § 26.189(c)(2) (emphasis added). Additionally, "[n]either the individual nor licensees and other entities may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional employed by or under contract to the licensee or other entity. . . . [O]nly that professional is authorized to modify the evaluation and recommendations." 10 C.F.R. § 26.189(d).

Although Boldt argues that he had not violated an FFD Policy, the Complaint and other materials in the record show that NSP had a "significant basis for concern that [Boldt] may be impaired while on duty." 10 C.F.R. § 26.189(c)(2). He reported for his 5:00 p.m. shift smelling of alcohol, was shaking, had a flushed face and glazed eyes, and admitted to consuming a 6-pack earlier that day. Dr. Jetzer identified actions to be taken with regard to Boldt's unauthorized access "to ensure that any possible limiting condition d[id] not represent a threat to workplace or public health and safety." 10 C.F.R. § 26.189(c)(2). The NRC Regulations mandated that NSP implement Dr. Jetzer's required actions. <u>Id.</u> NSP had no authority to modify the MRO/SAE's evaluation and recommendations. 10 C.F.R. § 26.189(d). Thus, it would have been impossible for NSP to disregard Dr. Jetzer's requirements and also comply with NRC regulations.

Boldt cites several cases to argue that the tension between his discrimination claim and federal nuclear safety laws is not substantial enough to warrant preemption. <u>See</u> Pl.'s Mem. Opp'n at 22–24 (citing <u>English</u>, 496 U.S. at 85; <u>Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 256 (1984); <u>Minshall v. Cleveland Illuminating Co.</u>, No. 2004-156, 2006 WL 1214795, at *9 (Ohio Ct. App. May 5, 2006); <u>Brown v. Ne. Nuclear Energy Co.</u>, 48 F. Supp. 2d 116 (D. Conn.

1999)). However, none of the cases cited by Boldt involved an employer who was mandated under specific NRC Regulations to impose a MRO/SAE's safety-related requirements which the plaintiff alleged to be discriminatory. Because NSP could not have disregarded the requirements without violating federal law, Boldt's state law discrimination claim is preempted.

## IV. CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Northern States Power Company d/b/a Xcel Energy's Motion for Judgment on the Pleadings [Docket No. 25] is **GRANTED**; and

2. Plaintiff Wade Boldt's claims are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 2, 2017.